THOMPSON, Presiding Judge.
On June 27, 2007, the Cherokee County Department of Human Resources (“DHR”) filed a petition to terminate the parental rights of A.R. (“the mother”) and D.B. (“the father”) to their son, A.L.B., and their daughter, K.M.B. DHR concurrently petitioned to terminate the mother’s parental rights to another son, C.D.B.; the identity of C.D.B.’s father has never been confirmed or adjudicated. The juvenile court (“the trial court”) received ore tenus evidence at a hearing on the termination petition on September 12, 2007, and on October 5, 2007, it entered a judgment terminating the mother’s parental rights relative to C.D.B., A.L.B., and K.M.B., and the father’s parental rights relative to A.L.B. and K.M.B. The mother filed a timely appeal from the judgment; the father has not appealed.
The evidence presented at the termination hearing shows the following relevant facts.[1] At the time of the termination hearing, C.D.B. was nearly five years old, A.L.B. was three years old, and K.M.B. was two years old. The children had been in DHR’s custody since two days after K.M.B. was born.
The mother was 28 years old at the time of the termination hearing. The record shows that the mother began using marijuana when she was 16 years old and began using methamphetamine when she was 17 years old, shortly before she became pregnant with C.D.B. The mother subsequently began a romantic relationship with the father, and they had a son, A.L.B. The mother and the father (sometimes collectively referred to as “the parents”) eventually moved in with the father’s parents (“the paternal grandparents”). Although the father is not C.D.B.’s biological father, he cooperated with the mother in raising and supporting C.D.B. The parents never married and, although C.D.B. bears the father’s surname, the father has never been declared C.D.B.’s legal father. The mother subsequently became pregnant with K.M.B. The mother admitted smoking marijuana two to three times a month throughout her pregnancy with K.M.B. Furthermore, the mother admitted “swallowing a bag of [methamphetamine]” a few days before she delivered K.M.B. The father denied knowledge of the mother’s drug use during her pregnancy.
K.M.B. was born on June 15, 2005. On June 16, 2005, the mother tested positive for marijuana and methamphetamine. Three nurses employed by the hospital testified that the mother’s behavior was erratic. Per the hospital’s request, a DHR social worker, Leah Manning, visited the mother in the hospital. The mother admitted her drug use to Manning and admitted having suicidal thoughts. The mother also advised Manning that the father had hit her while she was in the hospital and multiple times before.
After visiting the mother, Manning attempted to locate C.D.B. and A.L.B., whom the mother had said were being cared for by her mother (“the maternal grandmother”). Manning visited the maternal grandmother’s home; however, the maternal grandmother was not present. At the home, Manning found C.D.B., A.L.B., and four other children. The children were being cared for by the mother’s sister, Am.R. Manning testified that the maternal grandmother’s home was “very cluttered” and that she observed roaches on the kitchen counters and walls. The *751 children did not have appropriate clothing and had no underwear or diapers. The children showed Manning the food that they had eaten that day, which was the only food in the house — a jar of peanut butter that Manning saw had roaches in it. Manning also testified that while she was at the maternal grandmother’s home she observed the children run into the street several times without supervision by Am.R.
DHR took custody of C.D.B. and A.L.B. The children were examined by a doctor who noted a deep bruise approximately two and one-half inches long on C.D.B.’s upper, inner thigh. The doctor opined that the bruise had not been caused accidentally. On June 17, 2005, DHR petitioned the trial court to appoint a guardian ad litem to represent C.D.B., A.L.B., and K.M.B., and to grant temporary custody of all three children to DHR. The trial court granted DHR’s petition the same day and appointed a guardian ad litem to represent the children.
On June 20, 2005, the trial court heard ore tenus testimony from Manning and the father at a shelter-care hearing. Based on the testimony and on a written report from DHR, the trial court found that continuing placement of the children in the parents’ home would be contrary to the children’s welfare, and it ordered that temporary custody remain with DHR. Pending a July 12, 2005, dependency hearing, DHR placed the children with foster parents.
On the day of the June 20, 2005, hearing, the parents, the foster parents, and two DHR social workers met to develop an individualized service plan (“ISP”) regarding the children. The ISP provided that the parties would work toward reunification of the children with the parents. Per the ISP, the parents were to visit the children two days each week and the foster parents were to allow the parents to speak with the children by telephone two evenings each week. The ISP provided that the parents were to undergo psychological evaluations and substance-abuse assessments and then obtain counseling or treatment as recommended. The ISP was revised periodically thereafter.
The parents each submitted to drug tests on June 20, 2005. The mother tested positive for marijuana and methamphetamine. Pursuant to the ISP, DHR referred the mother and the father to the Family Life Center for substance-abuse assessment and treatment recommendations. Because of the mother’s history of drug use and depression, the Family Life Center recommended that she attend 24 sessions in its intensive outpatient program (“IOP”), 12 aftercare sessions, and 2 Narcotics Anonymous (“NA”) meetings per week. The Family Life Center further recommended that the mother be required to submit to random drug tests.
The ISP also required the parents to provide DHR with a list of relatives to be considered as resources for possible placement of the children. The parents identified two sets of potential relative resources: the paternal grandparents and the father’s brother and sister-in-law. Per the parents’ request, DHR considered the paternal grandparents first. However, on July 12, 2005, before DHR had completed its investigation, the trial court held a hearing to determine the children’s dependency.
At the time of the dependency hearing, the parents resided with the maternal grandmother. DHR social worker Amber Wynn testified at the hearing, as did the father and three nurses who had cared for the mother while she was in the hospital. The nurses described the parents’ behavior while the mother was hospitalized and confirmed that K.M.B. had tested positive for marijuana and methamphetamine *752 shortly after her birth. The father denied DHR’s allegations regarding his behavior and testified generally regarding his relationship with the mother.
Wynn described the parents’ circumstances and the ISP, noting that the parents’ psychological evaluations had not yet been scheduled. Wynn also stated that the parents’ visits with the children were scheduled once each week and that, although DHR had offered the parents additional visits, the parents had not advised DHR that they wanted to visit the children more often. DHR’s report, which was admitted into evidence at the termination hearing without objection, stated that the mother “was reminded that there was additional time that she could see the children and she never responded.” The report also noted that the mother was offered transportation to visits if she needed it. Regarding DHR’s consideration of the paternal grandparents as potential relative resources, Wynn testified that she had concerns about their ability to care for the children due to the paternal grandmother’s health and the paternal grandfather’s work schedule. Also, the paternal grandfather had expressed his unwillingness to care for the children.
On July 12, 2005, based on the ore tenus testimony it had received and on DHR’s report, the trial court ordered that placement of the children with the parents would be contrary to their welfare and that the children were dependent pursuant to § 12-15-1(10), Ala.Code 1975. The trial court ordered that DHR have continuing custody of the children pending a six-month review hearing.
The children remained in DHR custody for over two years. During that time, the trial court conducted several ore tenus hearings and determined each time that the children remained dependent. In May 2006, DHR requested that its permanency plan be changed from “return to parents” to “permanent placement with relatives”; the trial court granted that request. In March 2007, DHR requested and was granted additional time to explore potential relative resources. Finally, on June 27, 2007, DHR filed a petition to terminate the parents’ parental rights to the children.
Shortly after the children were determined to be dependent, the mother was evaluated by a psychologist. The psychologist’s report was entered into evidence. In that report, the psychologist records the mother’s admission that she used drugs “whenever I can now” and that her abuse of marijuana and methamphetamine had increased during the preceding three years. The psychologist also noted that the mother had developed an increasing problem with depression during the preceding year. The psychologist concluded that the mother required individual counseling, treatment for her substance abuse, and comprehensive parent training; he also recommended that the mother be treated with antidepressant medication.
The mother refused to be treated for her depression with prescription medication until March 2007, and it is unclear from the record whether she ever received such treatment. Until February 2006, the parents declined the counseling services offered to them by DHR and declined DHR’s offer of transportation to counseling sessions. During the spring of 2006, the parents received counseling for three months, paid for by DHR. However, in July 2006, the counselor terminated the parents’ treatment because the parents had not attended counseling sessions or responded to her attempts to contact them during the preceding month.
At DHR’s expense, the mother began receiving substance-abuse treatment through the Family Life Center’s IOP on *753 July 6, 2005. In late July or early August 2005, the mother was terminated from the IOP due to an excessive number of absences. The mother testified at the next review hearing that she and the father did not have a vehicle at that time. The mother tested positive for marijuana on September 26, 2005. After paying a reinstatement fee, the mother began receiving treatment again in October 2005. The mother complied with IOP treatment for several weeks and began receiving aftercare. However, the mother was placed back into IOP treatment after she and the father admitted to Wynn in January 2006 that they had both used marijuana.
In February 2006, DHR requested that the parents submit to drug tests. The parents were not tested at that time because, they maintain, the testing center was too crowded. DHR again requested that they submit to a drug test; however, the parents did not comply at that time. Subsequently, in late March 2006, the mother and the father submitted to drug tests; neither parent tested positive for illegal drugs. The mother continued treatment through the IOP, but in April 2006 she was placed on probation in the program due to poor attendance. The mother never completed the IOP and was terminated from the program in June 2006. The mother tested positive for methamphetamine in July 2006.
The mother did not receive treatment for her drug addiction between June 2006 and August 1, 2007. DHR reported that the mother had stated that the IOP and NA sessions were “boring.” Wynn stated that she spoke with the mother about the importance of completing the ISP requirements, including drug treatment, but that the mother did not respond. DHR reported that in April 2007 the mother again tested positive for drugs, although the mother testified that she did not recall that positive drug test. At the September 12, 2007, termination hearing, the mother testified that the last time she used drugs was in June 2007.
In August 2006, the mother and the father ended their relationship due to the mother’s drug use. The parents subsequently reconciled; however, at the time of the termination hearing, they did not reside together. Neither parent had maintained a consistent home between June 2005 and the September 12, 2007, termination hearing.
The mother was ordered to pay child support for all three children; however, the mother did not maintain consistent employment and did not pay child support until April 2007. The mother testified that she had not paid child support because she “couldn’t hold down a job.” At the time of the termination hearing, the mother had been jailed twice for failing to pay child support, had paid approximately $200 in support, and was approximately $8,400 in arrears in her child-support obligation.
Wynn testified that the parents did not begin attending parenting classes immediately because they had complained of feeling overwhelmed by what DHR was asking them to do and because DHR had had difficulty finding a resource to provide the training. However, in February 2006 DHR referred the parents to a program for intensive parenting training. The parents did not begin those classes until early April 2006, and the mother missed the first class. The parents subsequently completed two parenting programs.
The parents were originally scheduled to have two three-hour visits with the children each week. In December 2006, visitation was changed to one day each week. Throughout the more than two years the children were in DHR’s custody, the parents’ visits were supervised and usually took place at DHR’s offices. Wynn testi *754 fied that when the parents visited they were unable to effectively control the children. She opined that neither she nor other DHR representatives observed any change in the parents’ behavior or ability to properly discipline the children during visits after they had completed the parenting classes. DHR’s report stated that the parents often argued with each other during visits regarding how to discipline the children.
The parents denied that they had failed to supervise and discipline the children during visits. The mother testified that she believed she could handle all three children on her own and that she did not believe that the children were out of control or that she had done anything wrong during her visits with the children. However, the mother admitted at the termination hearing, “We’re supposed to do like our parenting class taught us, but I don’t.” She explained that the children were very young, she had limited time with them, and she did not believe there was enough time during visits for the children to be disciplined.
Wynn testified that the mother seemed unable to focus attention on more than one child at a time and had nearly slapped A.L.B. during one visit. Wynn further testified that the mother had failed to bond with K.M.B. and frequently had to be prompted to pay attention to K.M.B. The mother testified that she had bonded with K.M.B., stating, “we’re getting there” and “we’re close.” The mother stated, that she enjoyed hugging and kissing K.M.B. and that she felt the same toward K.M.B. as she did toward C.D.B. and A.L.B.
Wynn testified that the parents were not attentive to the children. Specifically, Wynn testified that the mother slept or read the newspaper at times during her visits with the children. Wynn stated that several times the parents failed to change the two younger children’s diapers; however, the parents denied this allegation. Additionally, Wynn stated that she observed the youngest child, K.M.B., place several small objects in her mouth without the parents noticing. Wynn testified that she advised the parents to watch K.M.B. closely lest she choke; however, the parents later failed to notice K.M.B. place objects in her mouth until she nearly choked on them.
In early 2006, K.M.B.’s doctor advised that the child should avoid certain foods and should be watched closely for food allergies. Wynn testified that DHR informed the parents of the doctor’s recommendations but that the parents persisted in feeding KM.B. foods that the doctor had advised her not to eat and foods that presented a choking hazard. Wynn testified that she heard the father state that “he didn’t care what any doctor said, that they would feed [K.M.B.] what they wanted when they wanted.”
Wynn testified that in 2005 the parents were frequently late or did not attend visits with the children. The parents often failed to advise DHR of their absence in advance, and the children were disappointed when they did not arrive. Because the children had to be transported to DHR’s office for visits with the parents, DHR thereafter required the parents to telephone DHR at least three hours in advance of their visits to confirm their attendance. The parents testified that they complied with DHR’s request, but they later admitted that they frequently failed to call in time to visit the children.
DHR’s report stated that DHR changed visitation times to suit the parents’ schedules. It is undisputed that DHR provided the parents with vouchers for gasoline that the parents or anyone who helped them could use to offset transportation costs. At times, DHR canceled visits because the *755 children were sick or because of its own scheduling difficulties. However, Wynn testified that, throughout the time the children were in DHR’s custody, the parents frequently missed visits with the children. DHR’s report to the trial court stated:
“There have been three months where [the parents] did not make any of their visits with the children. There have been four months where the parents missed all but one visit. There have been seven months, where [the parents] have missed half of their scheduled visits. There have been three months, where the parents missed only one of their visits. There have been two months out of twenty six that [the parents] have attended all of their scheduled visits with the children. [The parents] have had the opportunity to visit their children a total of one hundred and thirty five times. They have missed sixty nine visits.”
The parents did not visit the hospital when A.L.B. had his tonsils and adenoids removed, nor did they contact DHR or the foster parents to learn about his condition or recovery.
The parents admitted that they missed half of their scheduled visits with the children, and they admitted that several of the cancellations were their fault. However, they stated that DHR was responsible for canceling some of the visits, that at times they did not have transportation, and that many visits were canceled because they did not have access to a telephone and therefore had difficulty calling DHR in time. The mother testified that “there was all kinds of reasons” she did not visit the children. However, in May 2007 DHR reported that the mother admitted that she “usually did not come to visits when she had used” drugs. At the time of the termination hearing on September 15, 2007, the mother had not seen the children since June 15, 2007.
The record shows that DHR considered 16 relative resources for the children and attempted to perform home studies on those relatives who expressed interest in helping the children. DHR reported that none of those relatives were willing or suitable to care for the children. Several of the relatives DHR considered expressed an initial interest in helping the children, but they ultimately rescinded their offers to help, failed to maintain contact with DHR, or failed to take necessary steps to qualify as resources. Regarding the paternal grandparents, the paternal grandfather expressed that he did not wish to care for the children and the maternal grandmother eventually contacted DHR and advised that she could not be a resource for the children because of her responsibilities to her own children. Regarding the maternal grandmother, the record showed that, when the mother was a child, the DeKalb County Department of Human Resources had removed the mother and her siblings from the maternal grandmother’s home due to severe neglect and domestic violence relating to the maternal grandmother’s mental illness. Furthermore, when DHR found C.D.B. and A.L.B. at the time of KMJB.’s birth, they were in the maternal grandmother’s home; the conditions of that home, described above, rendered the home unsuitable for children.
Regarding the mother’s sisters, K.M. and Am.R., the record showed that K.M. had a history of involvement with DHR regarding her own children and that she had also been arrested in 2004 for the unlawful manufacturing of a controlled substance. DHR reported that, according to its policy, K.M. could not be considered as a resource for the children. Regarding Am.R., DHR reported that she could not “be considered as a resource due to her *756 being the children’s caregiver at the time of their removal.” Again, the circumstances of C.D.B. and A.L.B.’s removal were discussed earlier in this opinion.
At the time of the termination hearing, the children were in good health and had been in DHR custody for 26 months. The father did not testify at the termination hearing. Regarding C.D.B.’s biological father, the record showed that, beginning in July 2005, DHR had requested that the mother identify him on numerous occasions. The mother initially stated that she could not identify C.D.B.’s father. However, in early March 2007 the mother contacted DHR and identified C.D.B.’s putative father as M.O. The mother testified that she identified M.O. as C.D.B.’s putative father because C.D.B. was starting to look more like M.O. as he grew older. DHR reported that the mother stated that she “wanted [C.D.B.’s] biological father to pay her child support for the two years that [C.D.B.] was in her care.” At the time of the termination hearing, DHR had not been able to locate M.O. and had published a notice of termination in the Cherokee County Herald.
At the termination hearing, the mother testified that she had been jailed for 40 days because she had failed to pay a speeding ticket that, she testified, she had no money to pay. It is unclear from the record precisely when this incarceration occurred, although the mother testified that she began residing at a “three-quarter house,” God’s House of Faith, on August 1, 2007, after she had been released from jail. The mother began residing at God’s House of Faith six weeks before the termination hearing and five weeks after DHR had filed its petition to terminate.
As a resident of God’s House of Faith, the mother attended multiple support groups and treatment programs. The mother testified that she had not used drugs in three months and that, as a condition of her residence, she works and attends church. The supervisor at God’s House of Faith testified that the mother was doing well in the program and that she was complying with the requirements of the program. The mother stated that, in the three to four months preceding the termination hearing, her life had changed dramatically and that she was finally “learning how to live.” The mother stated that she loves the children and wants to be with them and to raise them. She stated that she expected to be employed for a long time. The mother had six months remaining in the treatment program at God’s House of Faith and testified that she wished to complete that treatment. The mother testified that although she was not in a position at the time of the termination hearing to care for the children, she believed she would be when she finished the treatment program.
On October 5, 2007, the trial court entered orders as to all three children, finding as to each:
“Based upon the reports and testimony offered by [the] Department of Human Resources, and upon consideration of the grounds for termination of parental rights as set forth in § 26-18-7 of the Code of Alabama, the Court finds from clear and convincing evidence that is competent, material and relevant in nature, that the parents of the minor child are unable and unwilling to discharge their responsibilities to and for the child. The Court further finds that the Cherokee County Department of Human Resources has made reasonable efforts to alleviate the causes placing said child in foster care. The Court further finds that the allegations in the petition to terminate the parental rights of the parents of said child have been established and the relief prayed for by *757 the Cherokee County Department of Human Resources in its Petition to Terminate Parental Rights is due to be granted. Less drastic measures than termination of parental rights have been unsuccessful and no viable relative resources exist for permanent placement.”
The trial court terminated the parental rights of the father as to A.L.B. and K.M.B., of the mother as to C.D.B., A.L.B. and K.M.B., and of C.D.B.’s unknown father as to C.D.B. The trial court transferred permanent legal custody of all three children to DHR and granted DHR authority to make permanent plans for their adoption. The mother filed a timely appeal.
“This court’s standard of appellate review of judgments terminating parental rights is well-settled. A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep’t of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is ‘required to apply a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its decision on conflicting ore ten-us evidence. Ex parte State Dep’t of Human Res., 834 So.2d 117, 122 (Ala.2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.”
J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).
Our courts use a two-pronged test to determine whether to terminate parental rights:
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). We must also consider the best interests of the children. J.C., 986 So.2d at 1186. Additionally, the 1984 Child Protection Act (“CPA”), §§ 26-18-1 to 26-18-11, Ala.Code 1975, provides “meaningful guidelines to be used by the juvenile court in cases involving the termination of parental rights.” § 26-18-2, Ala.Code 1975. Section 26-18-7 of the CPA provides:
“(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child ....
*758 “(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to ..., or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of [certain crimes.]
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
The mother argues on appeal that the trial court erred in terminating her parental rights because, she argues, clear and convincing evidence does not support a finding that the children were dependent. See Ex parte Beasley, 564 So.2d at 954. To support this argument, the mother relies heavily on the evidence regarding her own progress during the months preceding the termination hearing. In contrast, in her argument, the mother also summarizes DHR’s assertions that she was not capable of caring for the children, that she failed to bond with K.M.B., and that she did not exhibit effective parenting skills, and she argues that these assertions do not constitute clear and convincing evidence of dependence. The trial court determined, pursuant to § 26-18-7, Ala.Code 1975, that the parents were “unable and unwilling to discharge their responsibilities to and for the child[ren].” See § 26-18-7(a), Ala. Code 1975. With deference to the trial court’s findings of fact, we must determine whether its judgment was based on clear and convincing evidence.
The trial court received extensive and largely undisputed evidence regarding the mother’s use of marijuana from the time she was 16 years old, and her use of methamphetamine from the time she was 17 years old, until approximately 3 months *759 before the termination hearing. That evidence showed that the mother’s drug use rendered her unable to care for the children since June 2005. Furthermore, the mother admitted that she remained unable to care for the children at the time of the termination hearing. See § 26 — 18—T(a)(2) (In determining whether the parent is unable and unwilling to discharge her parental responsibilities, the court shall consider “excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.”).
The trial court received evidence regarding DHR’s efforts to reunify the children with the mother. DHR provided psychological and substance-abuse assessments for the mother. DHR provided substance-abuse treatment for the mother through the IOP in 2005, 2006, and 2007; however, the mother never completed that treatment. DHR provided parenting classes for the mother and provided the mother with gasoline vouchers to aid in her visitation with the children. DHR provided counseling services for the mother and offered to provide transportation for the mother to attend those counseling sessions. The mother did not consistently utilize those services and was terminated from them. DHR provided transportation for the children to visit with the mother as well as supervision and a location for the visits to take place. See § 26 — 18—7(a)(6) (In determining whether the parent is unable and unwilling to discharge her parental responsibilities, the court shall consider “[t]hat reasonable efforts by [DHR] ... leading toward the rehabilitation of the parent[ ] have failed.”).
The trial court received evidence that the mother was ordered to pay child support for the children and that she did not begin to do so until April 2007 because she “couldn’t hold down a job.” At the time of the termination hearing, the mother had paid approximately $200 in support and was approximately $8,400 in arrears. See § 26 — 18—7(b)(1) (In determining whether the parent is unable and unwilling to discharge her parental responsibilities, the court shall consider “[failure by the parent ] to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.”).
The trial court received evidence that the parents frequently did not attend visits with the children and that, out of a total of 135 opportunities to visit with the children, the parents missed 69 visits. The mother did not attempt to contact A.L.B. after he had surgery. Further, the mother testified that she had not seen the children at all during the three months preceding the termination hearing. See § 26 — 18—7(b) (2) (In determining whether the parent is unable and unwilling to discharge her parental responsibilities, the court shall consider “[f]ailure by the parent[ ] to maintain regular visits with the child in accordance with a plan devised by the department... .”); § 26 — 18—7(b)(3) (In determining whether the parent is unable and unwilling to discharge her parental responsibilities, the court shall consider “[fjailure by the pár-ente ] to maintain sufficient contact or communication with the child.”).
The trial court received evidence demonstrating that the mother had never completed the IOP treatment program, had never completed the counseling DHR provided, had often missed visits with the children, had delayed in providing a list of potential relative resources to DHR, had not maintained consistent employment between June 2005 and August 2007, had not provided child support for the children, and had not identified C.D.B.’s putative father until March 2007. See § 26-18-7(b)(4) (In determining whether the parent *760 is unable and unwilling to discharge her parental responsibilities, the court shall consider “[l]ack of effort by the parent to adjust his or her circumstances to meet the needs of the child.... ”).
Much of the evidence the trial court received relative to the factors identified in §§ 26-18-7(a)(2) and (6) and 26-18-7(b)(l), (2), (3), and (4) was undisputed. The trial court properly considered the § 26-18-7 factors regarding the mother’s unwillingness and inability to care for the children. Based on the foregoing, the trial court received clear and convincing evidence upon which to base a determination that the children were dependent.
The mother argues that we should reverse the trial court’s judgment based on the evidence of her current rehabilitative efforts. “This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.” D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003). However, “[i]n deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions.” T.B. v. Lauderdale County Dep’t of Human Res., 920 So.2d 565, 570 (Ala.Civ.App.2005).
The mother cites S.S. v. Madison County Department of Human Resources, 892 So.2d 944 (Ala.Civ.App.2004), to support her argument. In S.S., this court reversed a trial court’s decision to terminate a father’s parental rights when the evidence showed that DHR had not utilized reasonable efforts to assist the father and that the father had maintained consistent and active visitation with the child, had voluntarily participated in parenting classes, and had maintained consistent income and housing. At the time of the termination hearing in this case, although the mother was beginning to make progress in her rehabilitative efforts, her situation was materially distinguishable from that of the father in S.S. Specifically, DHR had provided the mother with assistance in several areas, the mother had not consistently visited the children, the mother had failed to obtain counseling as required by the ISP, and the mother had not maintained consistent income and housing.
The mother also cites B.B.T. v. Houston County Department of Human Resources, 985 So.2d 479 (Ala.Civ.App.2007). First, we note that B.B.T. was not a majority decision of this court and is not controlling authority. Furthermore, in B.B.T., the father maintained consistent visitation with the child after he was determined to be the child’s father, maintained a stable residence, and was financially able to care for the child. Thus, as with S.S., the mother’s circumstances are materially distinguishable from the facts in B.B.T.
We recognize the mother’s recent efforts toward treatment and rehabilitation. However, based on the evidence of record, the factors set forth in § 26-18-7, and the ore tenus standard of appellate review, the trial court received clear and convincing evidence to support a finding of dependency under the two-pronged test stated in Ex parte Beasley, 564 So.2d at 954.
 The mother also argues on appeal that the trial court erred because, according to the mother, DHR did not adequately investigate the current status of viable alternative relative resources for placement, namely the paternal grandparents, the maternal grandmother, and the mother’s sisters. The court must properly consider and reject all viable alternatives *761 to a termination of parental rights. Ex parte Beasley, 564 So.2d at 954.
The mother cites R.P. v. State Department of Human Resources, 937 So.2d 77 (Ala.Civ.App.2006). However, R.P. was not a majority opinion of this court and is not binding or controlling authority. Furthermore, R.P. itself and the decisions upon which it relies are materially distinguishable from this case. See R.P., supra (maternal grandmother testified regarding her willingness to be considered as a resource); V.M. v. State Dep’t of Human Res., 710 So.2d 915 (Ala.Civ.App.l998)(ma-ternal grandmother expressed interest in serving as a resource but was not considered by DHR); G.D.M. v. State, 655 So.2d 1020 (Ala.Civ.App.1995) (record on appeal did not contain evidence indicating that DHR had considered any family member as a viable alternative to termination); and T.D.M.V. v. Elmore County Dep’t of Human Res., 586 So.2d 931 (Ala.Civ.App.1991) (DHR performed no home studies and relatives testified as to their willingness to help with the children).
The record showed that DHR investigated each of the relatives the mother names as potential alternative resources for placement in her brief on appeal. DHR investigated the paternal grandparents; however, they expressed their unwillingness to care for the children and never again came forward to offer themselves as resources for the children. DHR’s investigation of the maternal grandmother showed that she was disqualified from serving as a resource for the children for several reasons, namely her own involvement with the DeKalb County Department of Human Resources relative to the mother and her siblings. DHR’s investigation of the mother’s sister, K.M., revealed that she, too, was disqualified from serving as a resource for the children due to her prior involvement with DHR regarding her own children and a prior arrest for the unlawful manufacturing of a controlled substance. Finally, DHR’s investigation into the mother’s sister, Am.R., revealed that she was disqualified from serving as a resource for the children because of her failure to provide suitable food, clothing, diapers, and supervision for C.D.B. and A.L.B. before they were removed from her care. Additionally, neither the maternal grandmother nor the maternal aunts notified DHR of their desire to serve as relative resources for the children. Indeed, none of the relative resources the mother identifies in her brief on appeal appeared at the termination hearing.
The record shows that between June 2005, when the children were taken into custody, and the September 12, 2007, termination hearing, DHR actively investigated potential relative resources for the children. DHR asked each relative it contacted to identify other potential resources. DHR requested and received extensions of time within which to pursue and investigate potential resources. DHR presented evidence at the termination hearing indicating that each of those relative resources who had come forward had ultimately discontinued contact with DHR. Based on this evidence, we cannot say that DHR failed to investigate the current status of viable alternative resources for placement of the children.
Based on the foregoing, we affirm the trial court’s judgment terminating the mother’s parental rights.
AFFIRMED.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.

. Without objection, the trial court admitted its entire file on the case into evidence at the termination hearing, including evidence it had admitted at previous hearings. Accordingly, in stating the facts we will consider the entire record on appeal.