THOMAS, Judge.
M.H. (“the mother”) appeals the judgments of the Cleburne Juvenile Court terminating her parental rights to K.J. (“the daughter”), case no. 2130232, and J.J. (“the son”), case no. 2130233 (the daughter and *474 the son are hereinafter referred to collectively as “the children”).[1]
In 2009 the mother was arrested for conspiracy to manufacture methamphetamine and for methamphetamine use. At that time the mother was jailed and the children were placed with G.B. (“the maternal grandmother”) pursuant to a safety plan. The maternal grandmother never sought custody of the children, and the mother was released from jail; the children returned to live with the mother in the trailer home of B.P., the mother’s then boyfriend. The children remained with the mother and B.P. until July 25, 2012. On that day, the Cleburne County Department of Human Resources (“DHR”) responded to a report that the mother and B.P. were abusing drugs and engaging in domestic violence in the presence of the children; the mother tested positive for methamphetamine on August 6, 2012.
Jennifer Rios, a DHR employee, testified regarding the events of July 25, 2012. Rios said that she had observed the son sleeping inside the trailer home, which was at a temperature of over 100 degrees. She said that the son was inappropriately dressed, hungry, extremely dirty, and suffering from scabies. The mother testified that the son had fallen asleep in a room that did not have air conditioning after playing outside in the dirt. She said that she had thought that the son had a rash resulting from either insect bites or from contact with poison oak and that she was treating him with an over-the-counter cream. Rios said that she had located the daughter at a neighbor’s house after the mother had lied to her about the daughter’s whereabouts; Rios said that the daughter had been swimming and that her hygiene was “okay.” In July 2012 the children were placed in a foster home and DHR initiated services for the family.
On July 2, 2013, DHR filed petitions in the juvenile court seeking to terminate the parental rights of the mother and L.J. (“the father”) to the children. See supra note 1. DHR alleged that the children were dependent, that the parents had failed to meet the needs of the children, that the mother had abused illegal substances, that the father was incarcerated, that DHR’s reasonable efforts to reunite the family had failed, and that no viable alternative to the termination of the parents’ parental rights existed. On July 15, 2013, the mother filed an answer to DHR’s petitions and a counterclaim seeking custody of the children. The juvenile court appointed a guardian ad litem for the children.
A termination-of-parental-rights trial was held on September 23, 2013. On November 7, 2013, the juvenile court entered its judgments terminating the mother’s parental rights and awarding permanent custody of the children to DHR. The mother filed a postjudgment motion asserting that clear and convincing evidence did not support the juvenile court’s findings that she was unable or unwilling to discharge her parental responsibilities, that her conduct was unlikely to change in the foreseeable future, that no viable alternative to termination existed, that DHR had expended reasonable efforts toward reunification, or that termination of the mother’s parental rights was in the children’s best interests. The mother also asserted in her motion that “[t]here was no judicial determination that an aggravating circumstance relieved DHR of providing reasonable efforts.”
*475 The children’s guardian ad litem filed a motion on November 27, 2013, in support of the mother’s postjudgment motion, asserting that the mother had completed all the goals set by DHR. He asserted that the mother had offered evidence demonstrating that she had completed drug rehabilitation, that she had obtained and maintained stable employment and adequate housing, that the children were closely bonded to the mother, and that the children desired to “continue their relationship with [the mother].”
A hearing on the mother’s post-judgment motion was held on November 27, 2013, and, on December 4, 2013, the juvenile court denied the mother’s post-judgment motion.[2] On December 9, 2013, the mother filed a timely notice of appeal seeking this court’s review of whether the juvenile court abused its discretion by terminating the mother’s parental rights because, she argues, the juvenile court erred by determining that DHR had provided clear and convincing evidence demonstrating that grounds for. termination of her parental rights existed.
“ ‘Our standard of review of a judgment terminating parental rights is well settled. “A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they áre plainly and palpably wrong.” J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). However, a trial court’s application of the law to undisputed facts is not given a presumption of correctness on appeal, and this court applies a de novo standard of review to questions of law. See J.A. v. C.M., 93 So.3d 953, 954 (Ala.Civ.App.2012).’
“J.K. v. Jefferson Cnty. Dep’t of Human Res., 114 So.3d 835, 842 (Ala.Civ.App.2012). .
“ ‘ “To terminate parental rights, the trial court must first determine from clear and convincing evidence that the child is dependent. S.F. v. Dep’t of Human Res., 680 So.2d 346 (Ala.Civ.App.1996). The trial court must then determine that there exists no alternative to termination. L.A.G. v. State Dep’t of Human Res., 681 So.2d 596 (Ala.Civ.App.1996).”
“ ‘M.W. v. Houston Cnty. Dep’t of Human Res., 773 So.2d 484, 485-86 (Ala.Civ.App.2000).’
“A.K. v. Henry Cnty. Dep’t of Human Res., 84 So.3d 68, 69-70 (Ala.Civ.App.2011).”
A.H. v. Houston Cnty. Dep’t of Human Res., 122 So.3d 846, 849-50 (Ala.Civ.App.2013).
Initially, we address the mother’s correct assertion that the juvenile court failed to enter its judgments in compliance with § 12-15-320(a), Ala.Code 1975 (requiring the entry of a final judgment within 30 days of the completion of a trial), and Rule 25(D), Ala. R. Juv. P. (requiring “finding[s] by written order within 30 days of completion of the trial”). The mother argues that, based upon the juvenile court’s failure to comply with § 12-15-320(a) and Rule 25(D), the juvenile court’s judgments are void for lack of jurisdiction. “An order entered by a trial court without jurisdiction is a nullity.” J.B. v. A.B., 888 So.2d 528, 532 (Ala.Civ.App.2004).
Clearly, the juvenile court committed a procedural error; however, a vio- *476 látion of a mandatory provision contained in a statute requires reversal only if the failure to comply impairs a substantial right of the appealing party. Although the mother is correct that lack of subject-matter jurisdiction can be raised at any time by the parties or by this court ex mero motu, see Burgess v. Burgess, 99 So.Sd 1237, 1239 (Ala.Civ.App.2012), we disagree that the juvenile court’s failure to comply with § 12-15-320(a) or Rule 25(D) creates a jurisdictional defect that renders the juvenile court’s judgments void.
Our research yields no Alabama caselaw directly on point. However, our supreme court has construed a similar provision of the Alabama Administrative Procedure Act (“the AAPA”), § 41-22-1 et seq., Ala.Code 1975. Section 41-22-16(a)(l), Ala.Code 1975, a part of the AAPA, provides that a “final order in a proceeding which affects substantial interests shall be in writing and made a part of the record” within 30 days after the conclusion of the hearing. In construing § 41-22-16(a), our supreme court held in Ex parte Nixon, 729 So.2d 277, 279 (Ala.1998), that, although the word “shall” indicates a mandatory action, “the record before [the supreme court] contain[ed] nothing to indicate that the legislature intended to deprive the hearing officer of jurisdiction if the officer did not render a final order within 30 days after concluding the hearing.”[3] We also find no reason in the present case to conclude that the legislature intended to deprive a juvenile court of jurisdiction over a termination-of-parental-rights action solely because it did not enter a final judgment within 30 days.
In In re J.L.K., 165 N.C.App. 311, 598 S.E.2d 387 (2004), the North Carolina Court of Appeals construed a statute similar to § 12-15-320(a), which statute provides that a final termination-of-parental-rights order “shall be reduced to writing, signed, and entered no later than 30 days following completion of the termination of parental rights hearing.” N.C. Gen.Stat. § 7B-1109(e). Like the mother in the present case, the petitioner in J.L.K. argued that, because it was not entered within 30 days of the hearing, the final order in that case was due to be vacated. J.L.K, 165 N.C.App. at 315, 598 S.E.2d at 390. The J.L.K court stated that, “[w]hile the trial court’s delay clearly violated the 30-day provision of N.C. Gen.Stat. § 7B-1109(e), we find no authority compelling that the [trial court’s] order be vacated as a result,” and, further, it found that the petitioner had not suffered any prejudice by the delay. Id. Likewise, the Tennessee Court of Appeals, presented with the same argument regarding a comparable statute, held that the 30-day requirement was not mandatory. See In re Isobel V.O. (No. M2012-00150-COA-R3-PT, Nov. 8, 2012) (Tenn.Ct.App.2012) (not reported in S.W.3d) (“We repeatedly have held that the time frame contained in the statute reflects the legislature’s intent that parental termination cases be handled in an expeditious manner and is not mandatory.” (citing In re Zada M. (No. E2010-02207-COA-R3-PT, April 11, 2011) (Tenn.Ct. *477 App.2011) (not reported in S.W.3d), citing in turn In re M.R.W. (No. M2005-02329-COA-R3-PT, May 3, 2006) (Tenn.Ct.App.2006) (not reported in S.W.3d))).
To be clear, the North Carolina Court of Appeals further explained in In re C.J.B., 171 N.C.App. 132, 134, 614 S.E.2d 368, 370 (2005), that “[its] holdings requiring [a party] to show prejudice should by no means be taken as an endorsement of the delay in meeting statutory time lines in adjudication proceedings.”[4]
Likewise, in the present case, we do not condone the juvenile court’s procedural failure; however, we also find no authority that compels us to vacate the juvenile court’s judgments for the sole reason that they were entered more than 30 days after the termination-of-parental-rights trial. Had our legislature intended that compliance with § 12-15-320(a) be a jurisdictional prerequisite, it most certainly could have stated that intention in the statute. We therefore conclude that the mother’s argument—that by failing to comply with § 12-14-320(a) or Rule 25(D), the juvenile court lost jurisdiction over this action—is without merit.
Next, the mother contends that the juvenile court erred by concluding that DHR had presented clear and convincing evidence indicating that she was unable or unwilling to discharge her responsibilities to and for the children. See § 12-15-319(a), Ala.Code 1975. Clear and convincing evidence is ‘“[evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ.App.2002) (quoting § 6-ll-20(b)(4), Ala.Code 1975).
The juvenile court had before it evidence indicating that the mother had abused illegal drugs in 2009 and in 2012. P.H., the children’s foster mother (“the foster mother”), testified that the children were placed in her home in July 2012. At that time, according to the foster mother, the children were “very small” and scared. They had not bathed recently, had lice, and the son had scabies. She said that the son, who was five years old at the time, would, for no reason, hit the family’s pet, his kindergarten classmates, and an infant to whom the son was not related who was also living in the foster home. Tia Allen, a DHR employee, testified that the son’s exposure to domestic violence had caused him to display violent behavior. The foster mother said that the son had urinated “anywhere and everywhere”; however, according to the foster mother and the son’s teacher, by the time of the termination-of-parental-rights trial, the son’s behavior had improved. Testimony indicated that the son had thrived due to the implementation of a predictable routine, counseling services provided by his school, and medication he had received upon his diagnosis of attention-deficit/hyperactivity disorder. Amanda Crenshaw, the son’s therapist, also testified that the son’s behavior had stabilized since his placement with the foster parents. The foster mother and the daughter’s teacher said that the daughter still had some academic issues but that the daughter had displayed appropriate effort in school.
Therefore, we discern no error by the juvenile court in concluding that the mother was unable or unwilling to dis *478 charge her responsibilities to and for the children because the juvenile court was presented with evidence indicating that the mother had engaged in domestic violence, had abused drugs, and had neglected the son’s developmental, physical, and medical needs. In other words, the juvenile court had ample evidence indicating that the children are dependent. See § 12-15-102(8)1., 2., 8., 6., and 8., Ala.Code 1975. In determining whether to terminate parental rights, a juvenile court is required to apply a two-prong test: “(1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.” B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)).
Having determined that the first prong of the two-prong test for terminating parental rights has been satisfied, we now turn to the mother’s argument that the second prong of the two-prong test has not been satisfied. The mother contends that the juvenile court erred by determining that no viable alternative to the termination of her parental rights exists. Specifically, the mother argues that her current conditions do not warrant the termination of her parental rights and that placement of the children with M.M. (“the maternal great-aunt”) and A.M. (“the maternal great-uncle”) was a viable alternative to the termination of her parental rights.
“The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court. See Ex parte J.R., 896 So.2d 416 (Ala.2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court’s factual findings regarding viable alternatives are correct. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). However, because of the serious nature of a judgment severing a familial relationship, see L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), this court conducts a ‘careful search of the record’ to determine whether such findings are supported by clear and convincing evidence. In re Moore, 470 So.2d 1269, 1270 (Ala.Civ.App.1985). See also Columbus v. State Dep’t of Human Res., 523 So.2d 419, 421 (Ala.Civ.App.1987); and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). ‘Clear and convincing evidence’ is ‘ “[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.” ’ L.M. v. D.D.F., 840 So.2d at 179, citing in turn Ala.Code 1975, § 6-11-20(b)(4).”
J.B. v. Cleburne Cnty. Dep’t of Human Res., 991 So.2d 273, 282 (Ala.Civ.App.2008).
Section 12-15-319(a), Ala.Code 1975, provides the statutory grounds for terminating a parent’s parental rights and states, in pertinent part, as follows:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge *479 their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following....”
(Emphasis added.)
Although some details vary, testimony presented at the trial indicated that the mother had obtained and maintained employment and had achieved a pay raise, that the mother had successfully completed drug-rehabilitation classes, and that the mother had successfully removed herself from an abusive relationship for a period of five months.[5] At the close of the termination trial, the children’s guardian ad li-tem said:
“My recommendation, Your Honor, just based on the evidence presented today and with my experience with this case, would be at this time I would not be in favor of [termination of parental rights]. The reason for that would be that the mother has shown improvement over the last few months.
“Now, ideally, yes, I would have liked to see that improvement to have started a month after this case was opened. My recommendation would be to revisit this in maybe six months, keep the current case open and reinstate services with the mother.”
Regarding the mother’s employment, DHR’s witness, Carrie Halladay, who was the mother’s former counselor, said that she had had seven counseling sessions "with the mother between April 2013 and August 2013. Halladay said that, within one month of beginning counseling, the mother had successfully obtained employment. Halladay said that she had helped the mother get a job working for Choice Fabrications in Rainbow City because the mother was motivated, was “worthy,” and had made efforts to be ‘reunited with the children.[6] Halladay testified that, although the mother did not have transportation or a driver’s license, the mother had arranged for her stepfather and friends to take her to work. The mother testified that she was employed full time and had achieved a pay raise upon her 90th day of employment. Halladay said that the mother earned up to $300 per week.
Regarding the mother’s drug abuse, Halladay said that, at the time of the termination trial, the mother did not abuse drugs or alcohol; Halladay said that the mother had submitted to drug screens and that the mother had always tested negative. She said that the mother had completed a drug-rehabilitation program at the Alethia House on November 1, 2012, and the mother offered a certificate of completion of that program into evidence. The mother testified regarding her relapse in July 2012 and her rehábilitation. She said: “Well, this time, I have a really strong support team, I am working every day, staying busy, and I am not going to relapse. So, I just take one day at a time that’s what they say in rehab. And sometimes you do relapse, but I’m not going to because I’m going to church, getting new friends that are supporting me at church, getting a church family, and just staying busy.” Allen testified that the mother had missed one drug screen in 2012 and four drug screens in 2013, which are considered positive drug screens. The mother did not *480 dispute that she had failed to submit to five drug screens; however, the mother explained, she had missed the drug screen in 2012 because she had had a job interview and the four drug screens in 2013 because, during that period, she had lived and worked in Etowah County and the screens were scheduled to be administered in Cleburne County.
Regarding the mother’s history of engaging in abusive relationships, the mother admitted that she had been in “unhealthy relationships,” but she said that she had moved out of B.P.’s home the week Halla-day had advised her to do so and that she had not seen B.P. since that time. It was undisputed that B.P. was a violent person who had physically abused the mother. Halladay confirmed that she had advised the mother to leave B.P. and that the mother had done so and had moved into a “shed” on the back of the maternal grandmother’s property in Etowah County. All DHR’s witnesses admitted that the mother did not live with or have a continuing relationship with B.P.
Halladay said that approximately 12 months of independence by the mother would be a “great indication” that the children would be safe with the mother and that the mother had achieved 6 months of significant progress; however, counseling with Halladay ended at 6 months because DHR was relieved of its duty to provide services. According to Halladay, with continued counseling, the mother could have continued to make progress and could have continued to develop independence. Halladay testified that the mother could have sought to continue counseling without DHR’s involvement, but Halladay did not recall explaining that alternative to the mother. The mother testified that she “wished” she could still see Halladay and that she had continued to contact Halladay for advice and encouragement by “text” messages.
Halladay said that the mother’s weaknesses were her inability to consistently manage her finances and her failure to obtain suitable housing; however, we note that the testimony indicated that, as of one week before the termination trial, while she was earning $8 per hour, the mother had saved $400 for a deposit on a rental house in Gadsden. Allen testified that the mother’s housing in the shed was a barrier to reunification, but, Allen explained, she had received notice that the mother had signed a month-to-month lease on a rental house in Gadsden less than one week before the trial, which had not provided DHR time to do a home study. In fact, the mother testified that she still lived in the shed at the time of the trial because she did not yet have electrical service in the newly leased rental house. The mother said: “I would like for the Judge to give me.a little bit more time so [DHR] can come out and do a home study and for me to do the parenting if that’s what I’m asked to do. I have the home, all they have to do is come out and do a home study.”
“This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.” D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003); see also A.R. v. State Dep’t of Human Res., 992 So.2d 748, 760 (Ala.Civ.App.2008) (stating that a court must consider parents’ current conditions or conduct relating to their ability to care for their children but may also consider the past history of the family). At the time of the termination trial, the children had been out of the mother’s custody for one year. Testimony indicated that, in that time, the mother had made significant progress to *481 ward becoming gainfully employed, drug-free, and free of an abusive relationship. During that year, the mother had paid child support and had maintained regular contact and communication with the children. Finally, the mother had obtained housing, which had not yet been assessed for its suitability.
Most persuasive to this court is the undisputed evidence indicating that the children enjoyed a beneficial emotional bond with the mother. Although this court has noted that, in some circumstances, it is not a viable alternative for a child to remain indefinitely in foster care, see, e.g., R.L.B. v. Morgan Cnty. Dep’t of Human Res., 805 So.2d 721, 725 (Ala.Civ.App.2001), our supreme court has more recently held that a juvenile court should maintain foster care or other third-party custodial arrangements without terminating parental rights when a child shares a beneficial emotional bond with a parent and the custodial arrangement ameliorates any threat of harm from the parent. J.M. v. Madison Cnty. Dep’t of Human Res., [Ms. 2120345, August 23, 2013] — So.3d -, -(Ala.Civ.App.2013).
The children’s guardian ad litem said:
“The children and [the mother] have a very strong bond. I’ve witnessed the children directly after a visit with [the mother] on maybe two occasions. The children are like different children after seeing her, in a positive way, not a negative way, and so I think that it’s only fair to the children to give her some additional time to just see.”
The maternal great-aunt testified that she had observed the mother with the children; she said: “[the children] do appear to be strongly involved with their mother, and her with them.” Allen said that the mother behaved appropriately with the children and that the mother and the children had “a strong bond.” Allen further testified that the mother had regularly visited the children and had brought snacks and gifts to the children. The mother said that she had taken the son to a movie for his birthday and that she had purchased clothing and restaurant meals for the children. Allen said that the mother had missed visiting the children only once, although distance and lack of transportation had negatively affected the mother’s frequency of visiting after she moved to Etowah County. Allen and the mother testified that the mother had elected to stay with B.P. for a period because she wanted to visit the children frequently. The mother said that she went to six or more of the children’s medical and dental appointments and to one counseling appointment with the son; Allen confirmed that the mother had attended the children’s medical appointments.
The foster mother testified that the mother’s communication with the children was appropriate, although she said that the son whined after visits[7] and “regress[ed] back to the baby”; she said that the daughter had expressed excitement when the mother had told her that she was working toward getting a house. The foster mother and the mother testified that the mother telephoned the children 3 times each week and that the telephone calls regularly lasted for 45 to 60 minutes. When the foster mother was asked about her “intentions,” she said: “[T]he kids are welcome at my house. They are set, they know our routine, we know them. I would like to go forward to possibly adopt them if [the parents’ parental rights were terminated].” She said that if she adopted the children she would have no objection to the children’s maintaining a “healthy and safe” *482 “connection” with the parents. She said: “[TJhere’s no way you can just take two people out of their lives and say ‘no more’ unless there’s abuse or there’s a problem going on.” [8]
“[T]he primary focus of a court in cases involving the termination of parental rights is to protect the welfare of children and at the same time to protect the rights of their parents.” Ex parte Beasley, 564 So.2d at 952. In the present case, the juvenile court erred by determining that DHR had presented clear and convincing evidence demonstrating that the conduct or condition of the mother is unlikely to change in the foreseeable future and, moreover, that the termination of the mother’s parental rights would protect the welfare of the children who, testimony indicated, share a loving bond with the mother. As we have often repeated:
“ ‘ “ ‘[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in [this] case[ ] “does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.” ’ ”
‘“D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d 439, 445 (Ala.Civ.App.2003) (quoting V.M. v. State Dep’t of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998)).’ ”
A.H. v. Houston Cnty. Dep’t of Human Res., 122 So.3d 846, 852 (Ala.Civ.App.2013).
Furthermore, although we recognize certain time constraints were at play in this case, we conclude that DHR failed to prove the unsuitability of the maternal great-aunt and the maternal great-uncle as custodians of the children.[9]
“In termination-of-parental-rights cases, our supreme court has held that ‘ “it is DHR’s burden to prove the unsuitability of one who seeks to be considered as the custodian of a dependent child.” ’ Ex parte J.R., 896 So.2d 416, 428 (Ala.2004) (quoting D.S.S. v. Clay County Dep’t of Human Res., 755 So.2d 584, 591 (Ala.Civ.App.1999)).”
D.F.H. v. State Dep’t of Human Res., 51 So.3d 1081, 1089 (Ala.Civ.App.2010).
Allen said that DHR sent a “willingness form” to the maternal great-aunt and the maternal great-uncle in 2012. According to Allen, the maternal great-aunt and the maternal great-uncle were initially interested in being considered as a relative resource but had later withdrawn themselves from consideration in a telephone conversation with Allen in August or September 2012, which the maternal great-aunt denied.
*483 Allen said that the maternal great-aunt had contacted her again in June 2013 (a few weeks before DHR filed the petitions seeking to terminate the mother’s parental rights) requesting to be considered as a relative resource for the children. Although DHR requested an expedited home study, the home study had not been completed at the time of the termination-of-parental-rights trial. Heather Evans, a DHR employee who was unsure of the children’s familial relationship to the maternal great-aunt and the maternal great-uncle, testified that in July 2013 DHR had requested a home study on “Mr. and Mrs. M.,” who are the maternal great-uncle and maternal great-aunt. Evans said that the maternal great-aunt had completed and returned a packet on August 20, 2013, which was approximately five weeks before the termination-of-parental-rights trial. Evans said that the children knew the maternal great-aunt and that Evans understood that the two-week delay in returning the application packet was caused when the maternal great-uncle had had heart surgery in July 2013. Evans said that she had begun the home study but that she had not completed it at the time of the trial. She said that she was concerned that the maternal great-aunt and the maternal great-uncle’s two-bedroom trailer was not adequate for the children and that she was still waiting for a criminal-history report and a DHR-history report regarding the maternal great-aunt and the maternal great-uncle. She said that she had received certain other background information but that she had not reviewed the information.
The maternal great-aunt testified that DHR had failed to contact her after she had returned a relative-resource form in 2012. She said that she had contacted DHR in 2013 after speaking to the mother’s attorney. The maternal great-aunt confirmed that she had taken two weeks to return the necessary paperwork in 2013 due to the maternal great-uncle’s heart surgery. She said that DHR had visited her home but that it had failed to set up a time to take her fingerprints. She said that she had waited one week before she pursued DHR’s attention to the matter. She said that she wanted custody of the children and that she wanted the mother to be reunited with the children “further down the line.” The maternal great-uncle testified that he had recuperated enough to be able to care for the children. He said that if the juvenile court awarded custody of the children to him, the daughter would have a bedroom and the son would sleep on a “fold-out couch.”
Thus, after a review of the testimony presented, we conclude that DHR failed in its duty to prove the unsuitability of the maternal great-aunt and the maternal great-uncle who sought to be considered as the custodians of the children. Therefore, our careful search of the record does not reveal clear and convincing evidence supporting the juvenile court’s determination that no viable alternative to termination exists.
Finally, the mother contends that DHR failed to provide reasonable services intended to reunite the family. Although there is no question that DHR is required to exert reasonable services toward the reunification of a parent and his or her child, it is not necessary for this court to analyze the mother’s argument regarding DHR’s alleged failuré to provide reasonable services. We pretermit any discussion of the issue because we reverse the juvenile court’s judgments and remand the causes on other grounds. See Favorite Mkt. Store v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App.2005).
In conclusion, the juvenile court did not err by determining that the children are dependent; however, termination of the mother’s parental rights to the children is *484 not warranted based upon the evidence in the record before this court regarding the mother’s current conditions and upon the juvenile court’s failure to properly consider all viable alternatives to the termination of the mother’s parental rights. Accordingly, the judgments of the juvenile court terminating the parental rights of the mother are reversed, and we remand the causes for further proceedings consistent with this opinion.
2130232 — REVERSED AND REMANDED WITH INSTRUCTIONS.
2130233 — REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.

. The parental rights of L.J. ("the father”), to whom the mother was never married, were also terminated. The father has not appealed the termination of his parental rights. Testimony indicated that the father was incarcerated and would not be eligible for release until 2016. He appeared as a witness in support of the mother at the termination trial.

. A transcript of the hearing on the mother’s postjudgment motion is not included in the record on appeal.

. Our supreme court also noted that § 41-22-20(f) provides:
"Unreasonable delay on the part of an agency in reaching a final decision [i.e., failure to render an order within 30 days after the hearing is concluded] shall be justification for any person whose rights, duties, or privileges are adversely affected by such delay to seek a court order compelling action by the agency.”
The Nixon court concluded that ”[t]his provision would be meaningless if the 30-day provision in § 41-22-16(a) was jurisdictional.” 729 So.2d at 279-80. It does not appear that there is a provision in the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala.Code 1975, that corresponds to § 41 — 22—20(f).

. In C.J.B., prejudice caused by a five-month delay and the loss of transcripts resulted in a reversal of the trial court’s judgment.

. Allen testified that DHR had never assessed the mother’s ability to parent or offered any parenting-skills services to the mother. When asked how parenting issues could have been addressed before the mother obtained suitable housing, Allen said: “I’m not sure how that could happen."

. At the time, Halladay also worked' for Choice Fabrications, and Halladay actually hired the mother on Halladay’s last day of work at the plant.

. We note that the foster mother was responding to a question posed regarding the children’s behavioral differences after visiting either the mother or the father.

. The father testified that, although he was incarcerated, the children had visited him weekly, that he had paid $358 per month in child support, which he had earned "cutting grass,” and that he had a "very, very close" relationship to the children.

. Allen said that in 2012 the parents had filled out relative-resource forms suggesting the paternal grandparents, the maternal grandmother, and two maternal aunts — EJ. and G J. — as potential relative resources. Allen said that the paternal grandparents were unwilling to be considered. She said that the maternal grandmother's house was not approved by DHR because the house was cluttered and because there were unsecured weapons in the house. She said that the maternal grandmother's three-bedroom house did not have the space to house seven or more people — the mother, the children, the four other residents including two other children, and other people the maternal grandmother occasionally housed. According to Allen, EJ. did not respond to DHR’s request and G J. was initially interested but later withdrew herself from consideration.