THOMPSON, Presiding Judge.
C.P.M. (“the mother”) and P.D.M. (“the father”) each appeal from the judgment of the Shelby Juvenile Court (“the juvenile court”) terminating their parental rights to their child (“the child”).
The record indicates the following! The mother and the father were not married when the child was born in the fall of 2010; however, there is no dispute'regarding the father’s paternity of the child. The Shelby County Department of Human Resources (“DHR”), Which had been involved with the mother and the father earlier,[1] removed the child from the mother’s custody at birth, but the child was returned to the mother within a month. A court order in place at that time stipulated that the mother was not to have contact with the father. Nonetheless, the mother and the father married about six months after the child was bom and began living together without notifying DHR. In September 2011, after the mother and the child were found living with the father in violation of the previous court order, the juvenile court entered an order removing the child from the parents’ home until the parents could complete certain services. When those services were completed, the child was returned to the parents in October 2012.
On February 6, 2013, DHR and the parents agreed that the cáse should be closed. However, soon after in February 2013, the mother and the father separated, accusing each other of being'unfaithful. At the end of January 2013, before the parties separated, the mother had begun dating another man, J.K., whom she met through a mutual friend. The father and J.K. had known one another in their youth. The father testified that J.K. was a “drug head,” and, after he learned that J.K, and the mother were dating, the father threatened to fight J.K. The father also threatened that the mother would- never see the child again if she did not. return to him after they had separated. The mother accused the father of pushing her down during one argument.
On February 15, 2013, the mother and the father each sought an order of protection from abuse (“PFA”) against each other, because, each said, the other had been making threats to hurt’ or kill the other. The parties were to take drug screens the day they sought their respective PFA orders. The father returned to the courthouse after submitting to the drug screen, which indicated that the father had used marijuana.
When the mother did not return to the courthouse after her drug screen (she tes *463 tified that she was not aware that she had to return), the court that issued the PFA order requested by the father included a provision in its PFA order directing that the mother was not to have contact-with the child. The father testified that it was never his intention to keep the mother from seeing the child, and, despite the court order, he agreed that the mother could visit with the child at the father’s cousin’s house.
On February 18, 2013, the father went to a house where the mother and'J.K. were staying with a friend. The mother and the father spoke outside at length. The father offered to attend anger-management counseling, but the mother told the father it was “too' late.” When the mother went back inside the house to use the restroom, the father went into the house and began opening the doors to each of the rooms. The father found J.K. in one of the rooms and began yelling and cursing at him and threatening to beat him up. The mother testified that she could hear the two fighting. Ultimately, J.K. shot the father three' times, in the leg, the hand, and the abdomen. The father was hospitalized; J.K. claimed he shot the father in self-defense. The gun used in' the shooting belonged to the mother. The child was at the house at the time of the shooting. Neither J.K. nor the mother was charged in Connection with the shooting.
Jasmin Morris, who works in the foster-care unit of DHR, testified that DHR was not notified of the shooting until two days later, on February 20, 2013. At that time, Morris said, the child was taken into protective custody by DHR. The mother testified that she had left the child with the father’s cousin until the details of the shooting could be worked out and because of the PFA order denying her contact with the child. Morris testified that the mother remained in contact with DHR after the shooting and attended her scheduled visitations with the child.
In the meantime, DHR conducted an investigation into the father’s shooting. Morris testified that DHR determined that J.K. had shot the father while defending himself and that the child had not been in danger. The report of child abuse and neglect arising from the- shooting incident was found to be “not indicated,” Morris said, and the child did not qualify as “being vulnerable.”
Since the child has been back in DHR’s custody, the mother has had another child (“the younger child”). The mother went to Tennessee to give birth to the younger child and was apparently gone from Alabama for three weeks. Although the mother originally told the father that the child was not his, by the time of the termination trial, it had been established that the father was the father of the younger child. The parties’ parental rights to the younger child were not terminated. In fact, Morris testified, DHR’s permanency plan for the younger child is reunification with the parents. Morris testified that the permanency plans for the child and the younger child are different because, Morris said, the child was in DHR’s care for the third time.
Morris testified that the mother had completed all of the services that DHR recommended for her. A psychological examination of the mother indicated that she had no mental issues that would prevent her from being able to parent the child. Other than the three weeks the mother was in Tennessee, Morris said, the mother has consistently exercised her visitations with the child. At the time of the trial, Morris said, the mother had unsupervised visitation periods with the child five days a week. Morris said that the mother had no substance-abuse issues and that there was *464 no indication that the mother had ever abused the child. In fact,-Morris said, she did not have a concern with the mother as a parent, and, she believed that the mother was a good mother. However, Morris said, the mother -made “bad choices with men,” specifically, with the father. Morris explained that the mother knew the father ¡had anger issues, knew the father did not want the child around J.K., and knew how he was likely to react around J.K., yet she still chose to expose the child to J.K. Therefore, Morris said, she had concerns about the child’s safety if the child were to be returned to the mother and tlie father,
Morris testified that, at the time of. the trial, .the -father had not regularly visited with the child because of his work schedule. . Morris agreed that some parents were able to have visitations in the evenings or on weekends, but, she stated, that arrangement would not be made for the father. Morris said that the father has anger issues and that DHR had “an issue” with the father’s attitude and temper. In reviewing the father’s testimony, it becomes apparent that he has a quick temper. During the proceedings, the father was belligerent and disrespectful. For example, while the father was testifying, the mother’s attorney objected on the ground that the testimony the father was giving was speculation. Before the trial court-could rule on the objection, the father said: “Object. That’s what your mouth is for.” The juvenile court admonished the father to “be calm about this.” However, the father had. similar reactions throughout the trial. Additionally, no reunification services had been offered to the father in 2013, Morris said. As is the case with the mother, DHR has no indication that the father has ever been abusive toward the child.
The trial was held over four days in August, November, and- December .2013. The juvenile court entered its judgment terminating the parental rights of the mother and the father on November 9, 2014, nearly 11 months after the last day of testimony was taken. The mother and the father timely filed a-joint motion to alter, amend, or vacate the judgment. The juvenile court denied the motion, and the mother and the father filed separate notices of appeal and submitted separate briefs to this court. The father’s and the mother’s appeals were consolidated ex mero motu by this court, on January 2, 2015.
In her brief to this court, the mother contends that the juvenile court’s judgment was not supported by clear and convincing evidence.
“This court’s standard of appellate review of judgments terminating parental rights is well settled. A juvenile court’s factual findings, based, on ore tenus evidence, in a judgment terminating .parental rights are presumed to.be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep’t of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is ‘required to apply:a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its decision on conflicting ore ten-us evidence. Ex parte State Dep’t of Human Res., 834 So.2d 117, 122 (Ala.2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.”
J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).
*465 Clear and convincing evidence is defined as
“[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
§ 6 — 11—20(b)(4), Ala.Code 1975.
In its judgment, the juvenile'court found that the mother and the father were not willing or able to exercise parental responsibility for the child “due to the faults and habits of the parents.” The juvenile court continued:
“The, Court specifically finds that neither party has made any substantial changes in their lifestyle as evidenced by the fact that neither party has a fit and suitable, home at the time of the final hearing in this matter, to wit:. The father testified that he currently resides with an individual whose children have been removed from her as a result of a case involving [DHR] and the mother is currently residing with [J.K.], the person whom the Court believes the mother set up to shoot the father of her two children, [the father]. It is evident to .this Court that [the child] has been in and out of the care of her parents her entire life due to the faults and habits of her parents. The Court further believes that the parents’ lack of substantial change in the lifestyle, even in the face of a Petition to Terminate their parental rights, only indicates that this child will remain subject to the turmoil inflicted by her parents and remain on. the roller coaster of being in and' out of care, without any permanent place to consider home, so long as she remains subject- to the parental rights of her parents.”
To terminate a parent’s parental rights, the juvenile court must détermine whether clear and convincing evidence supports a finding that the child is dependent, and the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990). Moreover, § 12-15-319(a), Ala.Code 1975, sets forth the grounds for termination of parental rights and the factors to be considered when determining whether a person’s parental rights are to be terminated; That statute provides, in pertinent part: ’’
“(a) If the juvenile. court finds from clear and convincing evidence, competent, material, and’ relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and. that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents-. In determining whether or not the parents are . unable or. unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court, shall, consider the following factors including, but not limited to, the following:

"....

“(12) Lack of effort by the parent to adjust.his or her circumstances to meet the needs ,°f the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
Morris testified that the reason DHR filed its petition to terminate the *466 parents’ parental rights to the child was because the child had been in the custody of DHR three times. However, in each instance,' DHR’s decision to remove the child from the mother’s custody appears to have been taken as. a precautionary measure and not as a result of actual threats or allegations of abuse or neglect of the child. The evidence indicates that the- first time the child was placed in DHR’s custody was at her birth, because DHR had been involved in a matter involving the father’s inappropriate discipline of the mother’s two older children. The child was returned to the mother in a matter of weeks, but the child was removed from the mother a second time when the mother and the father married despite a court order directing that the mother not have contact with the father. However, when the mother and the father completed the services that DHR had recommended for them, the child was returned to the home. DHR and the parties agreed that the case could be closed at that time. Within two weeks, however, the mother and the father had separated and the father and J.K, the mother’s boyfriend, engaged in a fight, resulting in the father’s being shot. Because the child was in the house when and where the Shooting occurred, DHR again removed her from the home. From its investigation of the shooting incident, DHR determined that abuse or neglect of the child was “not indicated.”'
Admittedly, as the juvenile court found, the testimony of the mother and the father appeared to be driven' by their dislike for one another, and the veracity of their testimony is questionable. Nonetheless; the evidence in this case is remarkable for what is lacking. Morris’s testimony indicates" that DHR had no evidence — or even reason to speculate — that "the child had been abused or neglected. There is no evidence indicating that the mother is a substance abuser or suffers from a mental impairment that would prevent her from being able to care for the child. The mother visits with, the child five days a week, and those visits are unsupervised. Morris testified that site has no concerns with the mother’s ability to parent and, in fact, said she was a good mother. According to Morris, her primary concern with the mother is her “bad choices with men,” specifically, the father. At the time of the termination trial, the mother no longer lived- with the father. Furthermore, DHR’s goal for the younger child, the child’s sibling, is reunification with the mother and the father. The child and the younger child currently live together in foster care.
“The right to parent one’s child is a fundamental right, and the termination of that right should occur ‘ “only in the most egregious of circumstances.’”” K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003) (quoting L.M. v. D.D.F., 840 So.2d 171, 172 (Ala.Civ.App.2002), quoting in turn Ex parte Beasley, 564 So.2d at 952). We conclude that, based on what is contained in thé record before us, the circumstances in this case do not reach that high bar. In other words, the record does not contain clear and convincing evidence to warrant the termination of the mother’s parental rights. Accordingly, that portion of the juvenile court’s judgment 'terminating the mother’s'parental rights is due to be reversed. Because we reverse the judgment as to the mother, we pretermit discussion of the other issués she raises on appeal.
The father argues in his brief on appeal that the juvenile court’s delay of approximately 11 months between the end of testimony and the entry -of the judgment demonstrated that the judgment was not supported by clear and convincing evidence of the father’s current conditions or conduct relating to his willingness or abili *467 ty to care for the child.[2] The mother and the father attached affidavits arid other documentary evidence to their joint post-judgment motion indicating that their circumstances had “changed dramatically” since the end of the trial 11 months earlier.[3] For example, according to their affidavits, the father and the mother have repaired their relationship 'and are no longer involved with the; people with whom they had relationships at the time of trial, both parerits were Continuing to make use of services provided by DHR, and both were employed. In the motion,- the parents asked the juvenile court to “set this matter for a dispositional trial to determine the custody” of the child. The juvenile court denied the postjudgment motion, noting that the mother and the father had not requested oral argument on the motion.
On appeal, the father correctly points out that the juvenile court failed to enter its judgment in compliance with Rule 25(D), Ala. R. Juv, P., which states that, “[i]n termination-of-parental-rights cases, the juvenile court shall make its finding[s] by written order within 30 days of completion of the trial.” In addition, § 12-15-320(a), Ala.Code 1975, requires a juvenile court to enter a final judgment within 30 days of the completion of a trial in a case involving the termination of parental rights.
Research reveals no Alabama caselaw directly addressing the issue raised by the father. In the context of addressing whether a juvenile court’s failure to enter a judgment within the time directed by Rule 25(D), Ala. R. Juv. P., rendered the judgment void, this court wrote: “Clearly, the juvenile court committed a procedural error; however, a violation of a mandatory provision contained in a statute requires reversal only if the failure to comply impairs a substantial right of the appealing party.” M.H. v. Cleburne Cnty. Dep’t of Human Res., 158 So.3d 471, 475-76 (Ala.Civ.App.2014).
“This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.” D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003); see also Ex parte T.V., 971 So.2d 1, 6 (Ala.2007).
In construing a similar, requirement that, in termination-of-parental-rights cases, judgments be entered within 30 days of the trial, North Carolina courts have noted' that the time requirement was implemented to protect the rights of all parties involved, including the parents, the children, the foster parents, and the potential adoptive parents. See In re T.L.T., 170 N.C.App. 430, 432, 612 S.E.2d 436, 438 (2005); In re L.E.B., 169 N.C.App. 375, 610 S.E.2d 424 (2005). The North Carolina Court of Appeals has opined that a delay in the entry of a judgment terminating parental rights also results in the delay of the parents’ abilities to appeal from the judgment, resulting in prejudice to the parents, and has reversed judgments entered six months after the conclusion of *468 the trial, In Re L.E.B., supra, and seven months after the conclusion of the trial, In re T.L.T., supra.
We agree with the father that the juvenile court’s judgment terminating his parental rights, entered approximately 11 months after the trial concluded, could not have been based on his current circumstances. In this case, the father submitted evidence in support of his postjudgment motion indicating that his circumstances had changed in the 11 months since ,the termination trial concluded. We conclude that the delay in this case substantially impaired the rights of the father, as well as those of the child. Because of'the juvenile court’s undue delay in entering the judgment, in violation of § 12-15-320(a) and Rule 25(D), Ala. R. Juv. P., and the prejudice to the parties caused by that delay, the judgment, insofar as it terminates the father’s parental rights to the child, must also be reversed.
For the reasons set forth above, the judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion.
2140202 — REVERSED ' AND REMANDED.
2130253 — REVERSED AND REMANDED.
PITTMAN, THOMAS, MOORE, and DONALDSON, JJ., concur.

. The mother has two children from a previous relationship. Those children were found dependent because, DHR said, the father in this case had “inappropriate[lyT disciplined one of them. At the time of the termination trial in this case, the older children were in the custody of their maternal grandmother. They are not involved in this termination ac-tiom

. The mother made a-similar argument on appeal. Because we have reversed the judgment terminating her parental rights on a separate ground, we need not address this argument as it pertains to the mother.

. None of the parties asked this court to direct the juvenile court to enter an order within 30 days of completion of the trial as required by Rule 25(D), Ala. R. Juv. P., and § 12-15-320(a), Ala.Code 1975.