Rel: March 21, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0384

_____

## C.A.M.

## v.

## Mobile County Department of Human Resources

## Appeal from Mobile Juvenile Court
## (JU-21-1551.04)

PER CURIAM.

C.A.M. ("the mother") appeals from a judgment of the Mobile Juvenile Court ("the juvenile court") terminating her parental rights to C.M. ("the child"), one of her three children. We affirm.

Background

In June 2023, the Mobile County Department of Human Resources ("DHR") filed a petition asking the juvenile court to terminate the mother's parental rights to the child. In its petition, DHR alleged that the mother had an extensive history of using illegal drugs, that she had not completed a substance-abuse-treatment program, that she suffered from mental illness, that she had not taken the necessary steps to obtain treatment for her mental illness, that she had not maintained stable housing, and that she had not maintained consistent employment. The petition also stated a claim for an award of child support while the child was in DHR's custody. The juvenile court entered an order appointing counsel to represent the mother and appointing a guardian ad litem to protect the interests of the child.

The juvenile court held a trial on October 17, 2023, and December 4, 2023, at which it received evidence ore tenus. The mother did not appear for the first day of the trial on October 17. She appeared for the second day of the trial on December 4 but did not testify.

Vincene Robinson testified that she was the current DHR social worker assigned to the child. Robinson testified that, in December 2021,

DHR had received a report that the mother and her three children were being evicted from their apartment. DHR arranged for the mother and her children to stay temporarily at a hotel. DHR subsequently received a report that the mother had a history with the Florida Department of Children and Families ("FDCF") because she had been using illegal drugs. DHR then asked the mother to submit to a drug screen, which she did. Her drug screen showed the presence of methamphetamine, amphetamine, and cocaine. Robinson testified that DHR had learned that FDCF had investigated reports that the mother was abusing alcohol and was using illegal drugs and that those investigations had resulted in findings that the mother had used alcohol, methamphetamine, opioids, amphetamine, and marijuana. Robinson said that DHR learned that FDCF had implemented a safety plan but was unable to obtain any other information from FDCF regarding what action it had taken after it had concluded its investigation. Robinson testified that, based on the mother's testing positive for illegal drugs in the drug screen that DHR had administered in December 2021, DHR had summarily removed the child and her two siblings from the mother's custody.

Robinson testified that, although the mother did not initially identify the child's father, DHR received a report that M.R. was the child's father. The mother gave DHR a telephone number for M.R., but DHR's initial attempts to contact M.R. were unsuccessful. Robinson said that, eventually, DHR was able to contact M.R. in 2023. Robinson testified that M.R. had denied that he was the child's father and that he had asked DHR not to contact him anymore.

When DHR removed the child from the mother's custody, the mother was unemployed and, after her temporary stay at a hotel, which DHR had arranged, she had begun sleeping in her automobile. Robinson testified that DHR had assigned her to the child in April 2022 and that she had reviewed DHR's records regarding the child. She testified that she was familiar with what had occurred before she was assigned to the child. Robinson said that, after DHR removed the child from the mother's custody, it had offered the mother services to assist her in reunifying with the child. Those services included counseling, a psychological evaluation, a drug assessment, random drug screening, parenting classes, and visitation with the child. Robinson said that DHR had held individualized-service-plan ("ISP") meetings on December 16, 2021;

4

December 22, 2021; January 12, 2022; July 26, 2022; October 13, 2022; and April 14, 2022. Robinson said that the mother had completed parenting classes but that she had not completed them until almost a year had elapsed since the removal of the child from her custody. The mother submitted to a psychological evaluation. Robinson testified that the mother was supposed to have at least 10 counseling sessions with Amy Turner but that she had attended only 4 before Turner discharged her for failing to consistently schedule appointments for the sessions. Robinson said that DHR had attempted to restart the mother's counseling with Turner in April 2023. Turner contacted the mother about restarting the counseling, but the mother told Turner that she could not meet with Turner because the mother was living in her automobile. Turner told the mother that she would meet with the mother anywhere that was convenient for the mother, but the mother still did not restart counseling.

Robinson testified that the mother had been diagnosed with several mental-health problems. Robinson said that, in April 2023, the mother had called Robinson and told her that she did not know where the door to the DHR office was located even though she had previously been to

5

DHR's office on multiple occasions to visit the child there. Robinson testified that the mother had told her that she felt that someone was always behind her and that someone was always out to get her. Robinson said that the mother had gone to The Shoulder, a drug-and-alcohol-rehabilitation facility, in April or June 2023 but that The Shoulder discharged her for a rule violation. Robinson said that The Shoulder would not disclose to DHR the nature of the mother's rule violation but that the mother had told Robinson that, while she was living in her automobile, a man had attacked and raped her and that that man had subsequently seen her in the parking lot of The Shoulder and had come to the facility. Robinson said that the mother had told her that The Shoulder thought she was putting other clients in danger because of her attacker's coming to the facility and that that was why The Shoulder had discharged her. Robinson said that she had asked the mother to provide her with corroborating proof that a man had attacked and raped her and that, although the mother had told her that she would provide the proof, she never did. Robinson said that the mother was at The Shoulder for approximately four to six weeks.

Robinson said that, after The Shoulder discharged the mother, the mother had started treatment at 7 Springs Ministries ("7 Springs"), an in-patient rehabilitation facility. Robinson testified that the treatment program at 7 Springs lasts 12 months and that the mother had an expected graduation date in June or July 2024. Robinson testified that 7 Springs administers drug screens; that the mother had signed a release allowing 7 Springs to report the results of the mother's drug screens to DHR; and that the mother had tested positive for alcohol, methamphetamine, and amphetamine in June 2023, when she first entered 7 Springs. Robinson said that the mother had not had any positive drug screens since June 2023.

Robinson testified that, before the mother had entered 7 Springs, she had asked the mother to submit to monthly drug screens. Robinson said that the mother had refused to submit to several of the drug screens but that she had submitted to one in April 2023, and it was positive for methamphetamine and amphetamine. Robinson testified that, since July 2023, 7 Springs had transported the mother to a facility run by AltaPointe for mental-health treatment and that the mother had had

monthly appointments at AltaPointe in July, August, and September 2023.

Robinson testified that the mother had had an apartment when DHR assigned Robinson to the child's case in April 2022 and that the apartment had been suitable for a child. Robinson said, however, that in April 2023, the mother's landlord had evicted her from that apartment.

Robinson testified that the mother had held temporary service jobs such as cleaning houses. She said that those jobs did not last more than two months. Robinson testified that, in October 2023, the mother was working part time at a fast-food restaurant, although she expected to be made full time soon. She said that the mother's income from her job at the fast-food restaurant was not sufficient to support her and the child. Robinson testified that the mother had consistently visited the child, that there had not been any problems during her visits, and that there was a bond between the mother and the child.

Robinson testified that the mother had filled out a relative-resource form listing as relative resources S.H. ("the grandmother"), the child's maternal grandmother; M.R., the child's alleged father; and E.C., the father of one of the child's siblings. Robinson said that she contacted the

8

grandmother and that the grandmother had filed a petition seeking custody of the child but that the juvenile court had dismissed the grandmother's petition for failure to prosecute because she did not appear for trial. Robinson said that DHR had also done a Seneca Search, which searches databases on the Internet, for relatives of the mother who might serve as a relative resource. Robinson said that DHR had sent letters to the relatives identified in the Seneca Search but that DHR had not received a response to any of those letters. Robinson said that DHR also performed a Federal Parent Locater search for relatives of M.R., the alleged father of the child. The Federal Parent Locater search identified M.R.'s address and the names and addresses of his relatives. Robinson testified that DHR had sent letters to M.R. and to all his relatives that the Federal Parent Locater search had identified. She said that one of M.R.'s aunts ("the aunt") called her and that she and the aunt did a three-way call with M.R. According to Robinson, the aunt told her that she was too old to take care of the child but that she could possibly find another relative who could care for her. Robinson testified that M.R. did not have any interest in caring for the child. Robinson said that she asked M.R. if he would submit to a DNA test but that he would not agree to do so. She

9

said that M.R. had also told her not to contact him again, so she did not. She testified that she had subsequently read an article in a newspaper stating that M.R. had been arrested on a murder charge in Pensacola and that he had been released on bond.

Robinson testified that the concerns that were preventing reunification of the mother with the child were the mother's inability to maintain stable housing, her mental-health problems, her drug addiction, and her inability to maintain consistent employment. She testified that, because the mother had a part-time job, was receiving mental-health treatment, and was receiving substance-abuse treatment, Robinson had considered waiting until the mother had completed the 7 Springs program before petitioning the juvenile court to terminate the mother's parental rights but that she had rejected that course of action because, she said, she did not think that it would be in the child's best interests because, she said, the child had already been in foster care for almost two years and because, she said, the mother had a habit of relapsing into the use of illegal drugs and losing her housing.

Robinson testified that, in her opinion, it would be detrimental to the child to sever the bond between the child and the foster parents.

10

Robinson testified that, in her opinion, the benefit to the child of achieving permanency with the foster parents outweighed any harm the child would suffer from the severance of the bond between her and the mother. Robinson testified that termination of the mother's parental rights was appropriate because, she said, the child had been in foster care for almost two years; because, she said, the child did not have a parent who was able to care for her; and because, she said, the child did not have a relative who was willing to care for her. Robinson said that adoption by the foster parents would provide the child with stability whereas the mother could not provide the child with stability in her current circumstances.

Robinson testified that the grandmother was the only maternal relative that the Seneca Search had identified that she called or e-mailed. She said that the mother had had visitation with the child twice per month until DHR changed the permanency plan for the child from return to parent to adoption by unidentified resource in April 2023. After the change in the child's permanency plan to adoption by unidentified resource, DHR reduced the mother's visitation to once per month. DHR placed the child with the current foster parents in June 2023 and, after

11

the foster parents indicated that they wanted to adopt the child sometime thereafter, DHR changed the permanency plan from adoption by unidentified resource to adoption by current foster parents.

Robinson testified that DHR's efforts to rehabilitate the mother had failed. She testified that permanency for the child was in the child's best interests. Robinson testified that DHR's goal with every child is to achieve permanency, and permanency is not achieved if a child remains in foster care.

The juvenile court accepted Jack Carney, PhD, a licensed psychologist, as an expert in clinical psychology. Dr. Carney testified that he had performed a psychological evaluation on the mother in April 2022. He testified that, during his interview of the mother, she appeared to be manic and even psychotic at times. He said that "she discussed things that were concerning regarding hypersexuality, paranoia, plots against her and her child, and very often the things that she would give as proof of other people's malicious behavior made very little sense."

Despite the mother's behavior during her interview, Dr. Carney opined that the results of the written tests he had given her were valid and accurate. The tests he had given her indicated that she paid

attention throughout the testing, that she put forth good effort, that she was consistent, and that the test results were valid. The tests indicated that she had an average IQ; in Dr. Carney's opinion, the mother did not have an intellectual deficit that would have interfered with her ability to understand the test questions or to respond appropriately.

Dr. Carney testified that the mother had told him that, in the past, she had tested positive for multiple drugs including methamphetamine. He testified that she minimized the importance of her drug use. He said that people who use methamphetamine have a high rate of relapse and that, therefore, they need a regimen of active substance-abuse treatment and to sustain an extended period of sobriety to minimize the chances of relapse. Dr. Carney testified that the mother did not appear to have much desire to maintain sobriety.

Dr. Carney diagnosed the mother with schizoaffective disorder -- bipolar type, paranoid personality disorder, major neurocognitive disorder, and traumatic brain injury. He diagnosed her with schizoaffective disorder -- bipolar type because, he said, the mother "has some emotional problems such as depression and anxiety, but then also has some manic problems in terms of pressured speech, some potential

13

for pleasure-seeking that gets her into trouble at times, but then there's also this component of where she's not quite reality based." He said that the mother "moves fluidly from being reality based to almost being psychotic to then maybe being floridly psychotic." He testified that the mother's paranoid personality disorder is characterized by "long-term contractible-type paranoia feelings that people are malicious and out to get her and harm her in some way." Dr. Carney opined that the mother's schizoaffective disorder -- bipolar type and her paranoid personality disorder would impair her ability to meet the day-to-day needs of her children. Dr. Carney testified that the mother's mental-health problems did not seem to be amenable to treatment because, he said, the mother had told him that she was taking Latuda, Trintellix, and Trazodone and receiving counseling yet was still exhibiting the symptoms of her mental-health problems during his evaluation of her. He testified that, even if the mother received all the additional treatment he had recommended, her prognosis was poor, and she was unlikely to be able to safely parent children in the future.

On December 18, 2023, 14 days after the second and final day of the trial, the juvenile court entered a judgment terminating the mother's parental rights. In the judgment, the juvenile court found:

"1. That the … child is under the age of 18 years and is within the geographical bounds of Mobile County, Alabama.

"2. That the mother was personally served by private process server on June 27, 2023.

"3. That the child has been in the custody of [DHR] since December 14, 2021, when the mother tested positive for cocaine, methamphetamines, and amphetamines on a hair follicle test after she and the children were evicted from their home.

"4. That the mother has a significant history with Florida Child Protective Services regarding drug abuse and homelessness. Before moving to Alabama with her three children, the mother was indicated for neglect and abuse by the state of Florida relating to her drug and alcohol use.

"5. 'That the mother does not have custody of the … child's two siblings. One of the siblings is placed with their father and the other sibling is in foster care.

"6. That [DHR] offered services towards rehabilitation and reunification for the mother which included the … child in December 2021, January 2022, July 2022, October 2022, and April 2023. Services offered included parenting classes, safe and stable housing, psychological evaluation, counseling, mental health treatment, drug screens, substance abuse treatment, and visitation. (Pet. Ex. 1)

"• That the mother submitted to some, but not all, of the requested drug screens. In June 2023, the

15

mother tested positive for alcohol, methamphetamine, and amphetamine. She has tested negative on screens she has submitted to since that date. The mother has failed or refused to submit to drug screens on a regular basis when asked.

"• That the mother submitted to a psychological evaluation with Dr. Jack Carney on April 5, 2022. Dr. Carney made the following treatment recommendations: 180-day residential substance abuse treatment, counseling, and mental health treatment. (Pet. Ex. 8)

"• That the mother was asked to complete a 180-day residential drug treatment program. She was discharged from The Shoulder in April 2023 and entered Seven Springs in June 2023. The mother may have still been in the treatment facility on the day of the first hearing in October 2023. No evidence was presented as to whether she successfully completed that program.

"• That the mother was referred to in-home family counseling with Amy Turner. The mother only completed four (4) of the required ten (10) sessions before she was discharged for nonattendance. A second referral was made but the mother did not attend any of these sessions.

"• That the mother is consistent in attending her mental health appointments with Alta Pointe.

"• That the mother has not maintained stable housing or employment while the child has been in [DHR] custody. The mother has been homeless and living in her car. She has been evicted twice since the child entered care.

16

"•   That the mother participated in visitation with the child once per month for one hour. The visits have gone well, and the social worker observed a bond between the mother and the child.

"•   That the mother has been cooperating with [DHR] since entering Seven Springs Treatment Facility in June 2023. These last-minute efforts, however, are unconvincing due to the mother's history of relapse, homelessness, and mental and emotional illness.

"•   That the permanency goal for the child has been adoption by current foster parent since August 2023. Although the social worker saw a positive change in the mother, the social worker felt that adoption by current foster parent was in the child's best interest based on the amount of time the child had been in foster care and the mother's history of relapse.

"7. That the mother suffers from emotional and mental illness as well as excessive use of alcohol and drugs such as to render her unable to care for the needs of the child and that the mother's inability to parent is unlikely to change in the foreseeable future. Dr. Jack Carney testified that he conducted a psychological evaluation on the mother. He diagnosed her with: Schizoaffective Disorder Bipolar type, Paranoid Personality Disorder, Major Neurocognitive Disorder, [Traumatic Brain Injury], Excessive use of controlled substances, (cannabis, alcohol, methamphetamines, opioid, and prescription use disorder) and failure to maintain material needs. Dr. Carney gave the mother a poor prognosis. The mother's recent attempts at maintaining sobriety and treatment for her mental illness would not change his opinion regarding her inability to care for children. That opinion was based on the mother's inability

17

to meet her own needs, a 70% chance of relapse and the fact that even on medications she exhibited active symptoms of paranoia. According to the testimony of Dr. Carney, the diagnosis of schizoaffective disorder is long term and not amenable to sustained change. (Pet. Ex. 8)

"8. That the mother has not contributed to the material needs or provided financial support for the child since the child has been in care.

"9. That there are no viable relatives known to the Court or to [DHR] to take care, custody, or control of the child.

> "• [DHR] attempted to contact the alleged father, [M.R.]. He denied he was the biological father and refused to submit to DNA [testing]. He requested no further contact from [DHR].

> "• The mother listed the alleged father, the siblings' father, and the [grandmother] on the [relative resource] form. The alleged father refused all contact, and the [grandmother] filed a petition but failed to follow through or have any further contact with [DHR]. (Pet. Ex. 2)

> "• [DHR] conducted a Seneca search and a federal parent locator and mailed letters to possible relatives. (Pet. Ex. 3, 4, 6). [DHR] received some responses to the letters, but no one was willing to be a placement resource for the child.

"10. That the child was placed in the current foster home on June 2, 2023. At the time the child was placed, the permanency plan was adoption with no identified resource. One month later, the plan was changed to adoption by current foster parents. (Pet. Ex. 7)

"This Court finds that [DHR] has made reasonable efforts to provide services to this family to avoid the filing of the Petition for Termination of Parental Rights and finds no viable alternative to termination of parental rights[,] which will serve the best interests of the child. Wherefore, the Court concludes that termination of parental rights and adoption by foster parents is in the best interest of the child. Having considered the ore tenus testimony and evidence offered on the hearing date[,] the Court finds that the Petition to Terminate Parental Rights is due to be GRANTED. This Court specifically finds that there is clear and convincing evidence competent, relevant, and material in nature that the mother, [C.A.M.], is not willing or able to discharge her responsibilities to and for the minor child. The Court further finds that there are no viable alternatives to Termination of Parental Rights and no potential relative resources available for the permanent placement of this child. This Court finds Adoptive resources have been identified for the minor child and [DHR] hopes to finalize the adoption shortly. In making the foregoing finding, the Court has considered the factors set forth in Section 12-15-319 (a) of the Code of Alabama [1975].

"The Court further specifically finds the following:

"(l) 'That [the child] is without a parent or guardian willing or able to provide for [her] support, training, and education.

"(2) That clear and convincing evidence, competent, relevant and material in nature has established that this child is dependent and in need of care and supervision by the state in that [her] legal parents are unwilling or unable to discharge their responsibilities to and for the minor child; that the conduct or condition of the parents renders them unable to properly care for the minor child and that said conduct or condition is unlikely to change in the foreseeable future.

"(3) That [the child] is dependent and in need of the care and Supervision of the State.

"(4) That [DHR] has investigated all viable alternatives to termination of parental rights and the court finds that there exist no other viable alternatives consistent with the best interests of the child, other than termination of parental rights.

"(5) That [DHR] has made all reasonable efforts towards rehabilitation of and reunification with the legal parents and such efforts have failed.

"(6) That [DHR] has made reasonable efforts to finalize the permanency plan for [the child] which plan is: (a) Adoption by foster parents following termination of parental rights.

"(7) The Court hereby approves the permanency plan indicated above.

"(8) That the above-named child is Dependent and in need of care and protection by the State of Alabama Department of Human Resources and that it is in the said child's best interest for [the] parental rights of the mother [to] be terminated so that said child can be placed for adoption.

"(9) [DHR] is equipped to care for and has agreed to receive the child upon commitment by final order of this court and to seek adoptive placement.

"(10) That guardianship and permanent legal custody of [the child] is hereby granted to the State of Alabama Department of Human Resources for permanent placement and adoption.

"(11) Upon the entry of a Final Order of Adoption by a Court of competent jurisdiction, [DHR] shall immediately notify this Court for closure of this case."

20

The December 18, 2023, judgment did not adjudicate DHR's claim for child support. The mother timely appealed from that judgment, and this court docketed her appeal as appeal number CL-2024-0001. Because the juvenile court's judgment did not adjudicate DHR's child-support claim, we dismissed the mother's appeal without an opinion because it was an appeal from a nonfinal judgment. C.A.M. v. Mobile Cnty. Dep't of Hum. Res. (No. CL-2024-0001, Apr. 1, 2024). We issued our certificate of judgment in appeal number CL-1014-0001 on April 19, 2024.

On April 23, 2024, the juvenile court entered a final judgment denying DHR's child-support claim. The April 23, 2024, judgment also reiterated verbatim the language of the juvenile court's December 18, 2023, order terminating the mother's parental rights.

On May 7, 2024, the mother filed a postjudgment motion in which she asserted that the juvenile court's entering the April 23, 2024, order, without holding a new trial, constituted a violation of § 12-15-320(a), Ala. Code 1975, and Rule 25(D), Ala. R. Juv. P., both of which require a juvenile court to enter a final order ruling on a termination-of-parental-

21

rights claim within 30 days after the completion of the trial.[1] The mother's motion also asserted that the juvenile court's entering the April 23, 2024, judgment, without holding a new trial, constituted a termination of her parental rights that was not based on her current conditions because, she said, four-and-a-half months had elapsed between the last day of the trial on December 4, 2023, and the juvenile court's entering its April 23, 2024, order, which reiterated verbatim the language of the juvenile court's December 18, 2023, order terminating the mother's parental rights. On May 21, 2024, the juvenile court denied the mother's postjudgment motion without stating its rationale for doing so. On May 27, 2024, the mother timely filed a notice of appeal.

<u>Standard of Review</u>

When a juvenile court bases its judgment on ore tenus evidence, a presumption of correctness attaches to the juvenile court's factual

---

[1]In pertinent part, § 12-15-320(a), Ala. Code 1975, provides: "[In termination-of-parent-rights actions,] [t]he trial court judge shall enter a final order within 30 days of the completion of the trial."

Similarly, Rule 25(D), Ala. R. Juv. P., provides, in pertinent part, that "[i]n termination-of-parental-rights cases, the juvenile court shall make its finding by written order within 30 days of completion of the trial."

findings, and an appellate court will not disturb those findings unless they are clearly erroneous, unsupported by the evidence, manifestly unjust, or against the great weight of the evidence. See L.S. v. A.S., 272 So. 3d 169, 179 (Ala. Civ. App. 2018). An appellate court reviews a juvenile court's conclusions of law and its application of law to the facts under the de novo standard of review. See Key v. Allison, 70 So. 3d 277, 281 (Ala. 2010).

## Analysis

A juvenile court may terminate a parent's parental rights if the party seeking the termination proves, by clear and convincing evidence, that one of the grounds for termination specified in § 12-15-319(a), Ala. Code 1975, exists and that no viable alternative to terminating the parent's parental rights exists. See R.H. v. Madison Cnty. Dep't of Hum. Res., 383 So. 3d 667, 672 (Ala. Civ. App. 2023). To establish grounds for terminating a parent's parental rights, the party seeking the termination must prove by clear and convincing evidence

> "that the [parent] of [the] child [is] unable or unwilling to discharge [her] responsibilities to and for the child, or that the conduct or condition of the [parent] renders [her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future."

§ 12-15-319(a). Moreover, § 12-15-319(a) directs the juvenile court to consider a nonexclusive list of factors in determining whether there are grounds for terminating a parent's parental rights. Those factors include whether the parent has an emotional illness, mental illness, or mental deficiency or has engaged in excessive use of alcohol or controlled substances of such a duration or nature as to render the parent unable to care for the needs of the child (§12-15-319(a)(2), Ala. Code 1975) and whether reasonable efforts by DHR to rehabilitate the parent have failed (§ 12-15-319(a)(7), Ala. Code 1975)).

We consider first the mother's contention that the juvenile court's April 23, 2024, entry of its final judgment violated § 12-15-320. That section provides: "The [juvenile] court judge shall enter a final [judgment] within 30 days of the completion of the trial [of a petition to terminate parental rights]." See also Rule 25(D), Ala. R. Juv. P. As the mother points out, more than four months had passed since the completion of the trial and the juvenile court's entry of the final judgment.

This court has held that a juvenile court's failure to enter a judgment within 30 days of the conclusion of a trial in violation of § 12-15-320 does not, standing alone, compel a reversal of its judgment. See

24

M.H. v. Cleburne Cnty. Dep't of Hum. Res., 158 So. 3d 471, 476 (Ala. Civ. App. 2014). Instead, a violation of that statute "requires reversal only if the failure to comply impairs a substantial right of the appealing party." See id.

As noted above, to terminate a parent's parental rights to his or her child, a juvenile court must consider whether a parent is unable or unwilling to discharge his or her responsibilities to and for the child or whether the parent's conduct or condition renders him or her unable to properly care for the child. § 12-15-319(a). "'This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.'" M.H., 158 So. 3d at 480 (quoting D.O. v. Calhoun Cnty. Dep't of Hum. Res., 859 So. 2d 439, 444 (Ala. Civ. App. 2003)). Thus, one of the ways in which a significant delay in the entry of a final judgment terminating a parent's parental rights can impair the substantial rights of that parent is when the judgment can no longer be said to have been based on the parent's current circumstances. See, e.g., A.P. v. Covington Cnty. Dep't of Hum. Res., 293

So. 3d 892, 901 (Ala. Civ. App. 2019); C.P.M. v. Shelby Cnty. Dep't of Hum. Res., 185 So. 3d 461, 468 (Ala. Civ. App. 2015).

In those cases in which we have reversed a juvenile court's judgment as having been entered too long after the conclusion of the trial, we have relied on more than just the temporal delay; instead, we also have considered whether the parent has demonstrated that his or her circumstances have, in fact, changed to the extent that a result other than termination of his or her parental rights may be obtained in light of evidence of the changed circumstances. See, e.g., A.P., 293 So. 3d at 901; C.P.M., 185 So. 3d at 468. See also Z.P. v. Mobile Cnty. Dep't of Hum. Res., [Ms. CL-2024-0177, Sept. 27, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024) (distinguishing that case from A.P. and C.P.M. for, among other reasons, parent's failure to file a postjudgment motion or otherwise show a change in circumstances). Thus, to protect his or her right to a judgment based on current circumstances, upon the delayed entry of a final judgment, a parent should at least file a postjudgment motion alleging that the circumstances have materially changed in the interim between the trial and the entry of the final judgment so that, upon a consideration of the evidence of current circumstances, the termination petition could

be denied. See Z.P., ___ So. 3d at ___ (discussing the holdings in A.P. and

C.P.M.).  Absent such a motion, or some similar proffer, the parent waives

any such violation by the juvenile court. See id.

In this case, on May 7, 2024, the mother filed a postjudgment

motion providing, in pertinent part:

> "7. THAT the Court's record reflects that the trial in this matter began on October 17, 2023[,] and concluded on December 4, 2023[,] and that an Order was entered on December 18, 2023. The Mother appealed that Order to the Alabama Court of Civil Appeals. Upon review of that Order and letter briefs being requested from and filed by the Department of Human Resources and the Attorney for the Mother, the Court of Civil Appeals issued an Order finding that the Order entered on December 18, 2023[,] was not a final Order and this case was remanded to this Honorable Court for further proceedings.

> "8. THAT, without a further Hearing or an opportunity for the Parties and the Court to address any potential changes in the situation of the Parties, this Honorable Court entered an Order amending the initial Order. That Order was entered on April 23, 2024.

> "9. THAT the severity and nature of these proceedings are such that the Alabama Court of Civil Appeals and the Alabama Supreme Court have held that at the time of entry of a final Order terminating the Parent's parental rights the Juvenile Court must consider the parent's 'current circumstances.'

> "10. THAT at the time the Amended Final Order was entered, four and a half (4 1/2) months had passed thus

27

presenting <u>a need to re-evaluate the current circumstances of the Mother</u>.

"11. THAT without another Hearing to revisit this case, <u>it appears to the Undersigned that an Order entered four and one half (4 1/2) months after the final Hearing would not be based on the Mother's current circumstances</u>.

"12. THAT <u>prior to the final Hearing on December 4, 2023[,]</u> the Mother had made significant efforts toward rehabilitating herself since June of 2023.

"13. THAT the Social Worker testified at trial that there is a recognizable bond between the Mother and the Minor Child and that the Mother <u>had made positive changes</u>.

"14. THAT based on the foregoing and the Mother's fundamental rights to parent her child, the Mother is entitled to Hearing to address her current circumstances."

(Emphasis added; bold typeface omitted; capitalization in original.)

In her postjudgment motion, the mother alleged only that some evidence at trial indicated that she was progressing in her rehabilitation and that, <u>potentially</u>, that progress may have continued after trial so that the judgment <u>possibly</u> may not reflect her current circumstances, and she asked the juvenile court to reevaluate the case to determine if any material change of circumstances had occurred. The mother did not allege that, <u>in fact</u>, she had continued to progress in her rehabilitation and that, <u>in fact</u>, her current circumstances showed that she was now

able to properly parent the child. The postjudgment motion contains no factual allegations as to any developments occurring after the trial date that would warrant a reexamination of the case. In the absence of such concrete allegations, the juvenile court was not required to vacate its final judgment and conduct a new trial to ascertain whether a material change of circumstances had occurred. Thus, we conclude that the mother's contention lacks merit.

The mother next contends that clear and convincing evidence did not support the juvenile court's finding that there were grounds for terminating her parental rights. Again, we disagree. The juvenile court had before it undisputed evidence indicating that the mother suffered from emotional and mental disorders that prevented her from caring for the child for the foreseeable future. The juvenile court also had before it undisputed evidence indicating that the mother's use of alcohol and illegal drugs was of such a nature and duration that it would prevent her from parenting the child for the foreseeable future. Moreover, the juvenile court had before it undisputed evidence indicating that DHR had made reasonable efforts to rehabilitate the mother and that those efforts had failed. Accordingly, we conclude that the juvenile court had before it

29

evidence from which it reasonably could have been clearly convinced that there were grounds for terminating the mother's parental rights to the child.

The mother next contends that the juvenile court erred in finding that there were no viable alternatives to terminating her parental rights. However, Robinson testified that DHR had thoroughly investigated to determine whether there were any suitable relatives who could serve as relative resources who could care for the child while the mother continued her effort to rehabilitate herself. Robinson's undisputed testimony was that there were no relatives who were both willing and able to care for the child. Thus, we conclude that the juvenile court had before it evidence from which it reasonably could have been clearly convinced that there were no viable alternatives to terminating the mother's parental rights to the child.

Finally, the mother contends that the juvenile court erred in failing to conduct a hearing regarding her postjudgment motion. Although it is error for a juvenile court to rule on a postjudgment motion without a hearing when the movant has requested a hearing, it is not necessarily reversible error. See Greene v. Thompson, 554 So. 2d 376, 381 (Ala. 1989).

A failure to hold such a hearing is harmless error where there is either no probable merit to the grounds asserted in the motion or where the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court. Id. In the present case, we have concluded that there is no probable merit to the grounds that the mother asserted in her postjudgment motion and, therefore, we conclude that the mother's postjudgment motion had no probable merit. Id. Consequently, we will not reverse the juvenile court's judgment based on its failure to conduct a hearing on the mother's postjudgment motion.

## Conclusion

For the reasons discussed herein, we affirm the judgment of the juvenile court.

AFFIRMED.

All the judges concur.